```
                  UNITED STATES DISTRICT COURT
                     DISTRICT OF MINNESOTA
                   Civil No.: 18-800(DSD/BRT)
```

OptumHealth Care Solutions, LLC,

      Plaintiff,

v.                                                 **ORDER**

Sports Concussion Institute Global, Inc.,

      Defendant.

> Michelle S. Grant, Esq. and Dorsey & Whitney LLP, 50 South 6th Street, Suite 1500, Minneapolis, MN 55402, counsel for plaintiff-counterclaim defendant.
>
> David M. Anderson, Esq. and Mahoney Anderson LLC, P.O. Box 44504, Eden Prairie, MN 55344, counsel for defendant-counterclaim plaintiff.

This matter is before the court upon the partial motion to dismiss counterclaims by plaintiff (and counterclaim defendant) OptumHealth Care Solutions, LLC (Optum). Based on a review of the file, record, and proceedings herein, and for the following reasons, the court grants the motion in part.

**BACKGROUND**

This contract dispute arises out of two agreements between Optum and defendant (and counterclaim plaintiff) Sports Concussion Institute Global, Inc. (SCIG). Optum is a health care services company, Compl. ¶ 2, and SCIG develops concussion management systems for patients, Szalapski Decl. Ex. 1 at 1. The first

agreement, entered into on March 15, 2016, is a Letter of Agreement (LOA) setting forth the parties' agreement to "develop a National Behavioral Health (NBH) network to treat the emotional/psychiatric sequelae of post-concussion syndrome" in youth and adolescents. Id. The LOA states that the parties "contemplate" entering into a joint venture in the future, but does not include any details as to how such a joint venture would be structured. See id. The parties agreed that the LOA would remain in effect "until the final agreement ... has been developed and executed by the parties" or, if no such agreement is reached, until December 31, 2016. Id. at 2.

On October 20, 2016, the parties entered into a second agreement, the Marketing Agreement (Agreement), under which they agreed to provide concussion services to members of the class action settlement arising from the National Football League players' concussion injury litigation.[1] Szalapski Decl. Ex. 2 at 1, 10. The Agreement expressly states that it does not "amend, supersede, or replace" the LOA and that "the LOA shall continue to be in full force and effect." Id. § 8.5. Under the Agreement, Optum agreed to establish and execute a marketing plan for SCIG and to pay SCIG a marketing fee. Id. Art. 1; id. § 2.1. In return, SCIG agreed to promote Optum's concussion services and to use

---

[1] The Agreement references other agreements and potential agreements, most of which are not relevant to the instant motion and will not be discussed. See id. at 1.

2

Optum's marketing materials. Id. Art. 3. The parties agreed to share the net revenue earned under the Agreement. See id. § 3.4.

The Agreement, effective October 20, 2016, has a three-year initial term. Id. § 6.1(a). The parties are permitted to terminate the Agreement at any time with ninety days' written notice. Id. § 6.2(b). In the event of termination before the initial term expires, SCIG "shall immediately pay" Optum an early termination fee of $2.5 million less certain margin payments received by Optum. Id. § 6.2(e).

On June 20, 2017, Optum notified SCIG in writing that it was terminating the Agreement effective September 21, 2017. Compl. ¶ 13. Optum thereafter requested confirmation that SCIG would pay the termination fee as required by § 6.2(e) of the Agreement. Id. ¶ 14. SCIG did not substantively respond to that letter or to subsequent requests by Optum for payment. Id. ¶¶ 15, 17-18.

On March 22, 2018, Optum filed this suit alleging breach of contract based on SCIG's failure to pay the termination fee. ECF No. 1. SCIG filed an answer and counterclaims on April 27, ECF No. 7, and later filed amended counterclaims alleging breach of fiduciary duty, breach of contract, breach of the implied covenant of good faith and fair dealing, quantum meruit, and fraud in the inducement. ECF No. 16. Optum now moves to dismiss the breach of fiduciary duty, quantum meruit, and fraudulent inducement counterclaims.

**DISCUSSION**

**I. Standard of Review**

To survive a motion to dismiss for failure to state a claim, "'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff [has pleaded] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007)). Although a complaint need not contain detailed factual allegations, it must raise a right to relief above the speculative level. Twombly, 550 U.S. at 555. "[L]abels and conclusions or a formulaic recitation of the elements of a cause of action" are not sufficient to state a claim. Iqbal, 556 U.S. at 678 (citation and internal quotation marks omitted).

The court does not consider matters outside the pleadings under Rule 12(b)(6). Fed. R. Civ. P. 12(d). The court may, however, consider matters of public record and materials that are "necessarily embraced by the pleadings." Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999) (citation and internal quotation marks omitted). Here, the LOA and the Agreement are properly considered by the court.

4

**II. Breach of Fiduciary Duty**

SCIG alleges that Optum owed it a fiduciary duty as its co-joint venturer under the LOA and by incorporation under the Agreement, and that Optum breached that duty by failing to provide SCIG with a marketing plan.[2] Am. Countercl. ¶¶ 11-14. Optum argues that SCIG has failed to properly plead that the parties had a fiduciary relationship. The court agrees.

To establish a breach of fiduciary duty claim, a plaintiff must prove the existence of a fiduciary duty, breach of that duty, causation, and damages. Conwed Corp. v. Emp'rs Reinsurance Corp., 816 F. Supp. 1360, 1362 n.3 (D. Minn. 1993). Under Minnesota law, a fiduciary duty arises in the context of a joint venture.[3] Lipinski v. Lipinski, 35 N.W.2d 708, 712 (Minn. 1949). "The existence of a joint venture ordinarily presents an issue of fact, but the district court may decide the issue as a matter of law if there is no competent evidence to support a finding of joint venture." Dorsey & Whitney LLP, v. Grossman, 749 N.W.2d 409, 416 (Minn. Ct. App. 2008). The party claiming a joint venture must establish the following four elements:

> (1) each party must make a contribution of money, property, time, or skill to the enterprise; (2) the parties must have joint proprietorship and control such

---

[2] SCIG also alleges that Optum failed to take other unspecified actions as required by the joint venture. Id. ¶ 13.

[3] The parties agree that Minnesota law applies to this dispute.

5

> that each party has a proprietary interest and the right of mutual control over the enterprise; (3) the parties must have an express or implied agreement to share the profits, but not necessarily the losses, from the enterprise; and (4) the parties must have entered into an express or implied contract.

Id. (internal citations omitted).

Here, SCIG has failed to properly allege the existence of a joint venture, and thus a fiduciary relationship between the parties. First, SCIG only conclusorily alleges that the parties entered into a joint venture without providing any factual basis for that assertion. See Stinson v. U.S. Bank, NA, No. 12-68, 2012 WL 2529354, at *6 (D. Minn. June 13, 2012) (dismissing joint venture claim because plaintiffs offered only conclusory allegations of the required elements). Second, neither the LOA nor the Agreement create a joint venture. The LOA refers to the parties' relationship as a "contemplated" joint venture, but does not state that the parties have actually established a joint venture. Szalapski Decl. Ex. 1 at 1. Further, the terms of the LOA do not set forth the required elements of a joint venture. There are no provisions addressing each party's contributions, establishing mutual control, or identifying a profit-sharing plan. Rather, the LOA merely expresses the parties' intention to exchange information to further their "mutual interest in developing programs" for post-concussion syndrome in youth and adolescent athletes. Id.

The Agreement likewise fails to establish a joint venture and,

in fact, expressly disavows the existence of a joint venture: "The Parties are independent contractors and nothing in this Agreement or otherwise shall be deemed or construed to create any other relationship, including one of employment, joint venture or agency." Szalapski Decl. Ex. 2 § 8.8. Although not dispositive, the contractual disclaimer is "strong evidence that the parties did not intend that their cooperative undertaking create a ... joint venture." Ringier Am., Inc. v. Land O'Lakes, Inc., 106 F.3d 825, 829 (8th Cir. 1997). The Agreement itself supports the disclaimer because it fails to establish mutual control by the parties, a required element of a joint venture. Grossman, 749 N.W.2d at 416.

SCIG also attempts to establish a joint venture by arguing that the parties incorporated the LOA into the Agreement, but the documents themselves undermine that argument. Although the Agreement provides that it does not "amend, supersede, or replace" the LOA and that "the LOA shall continue to be in full force and effect[,]" such language cannot be reasonably construed as incorporating the LOA into the Agreement. Szalapski Decl. Ex. 2 § 8.5. Nor does the Agreement elsewhere state that the LOA is incorporated into the Agreement. See id. Ex. 2. Indeed, the LOA and Agreement address separate and distinct programs - the former envisions a program for post-concussion syndrome in youth and adolescent athletes and the latter addresses post-concussion treatment for members of the NFL. Id. Ex. 1 at 1; id. Ex. 2 at 1.

7

Even if the LOA were somehow incorporated into the Agreement, however, the allegations and agreements themselves, whether considered separately or together, simply do not support SCIG's claim of a joint venture.

Because SCIG has failed to plead the elements required to establish a joint venture, its breach of fiduciary duty claim must be dismissed.

**III. Quantum Meruit**

SCIG alleges that it is entitled to relief under the doctrine of quantum meruit because it performed its obligations under the Agreement without reasonable compensation from Optum. Am. Countercl. ¶¶ 23-26. Optum argues that this claim must be dismissed because it is governed by an express contract. SCIG responds that it has properly pleaded quantum meruit in the alternative.

"Recovery in quantum meruit may be obtained where a benefit is conferred and knowingly accepted under such circumstances that would make it unjust to permit its retention without payment." In re Stevenson Assocs., Inc., 777 F.2d 415, 421 (8th Cir. 1985) (citing Ylijarvi v. Brockphaler, 7 N.W.2d 314, 319 (Minn. 1942)). "[T]here can be no recovery in quantum meruit where a valid express contract between the parties exists." Id. (citing Breza v. Thaldorf, 149 N.W.2d 276, 279 (Minn. 1967)).

Here, SCIG has expressly called into doubt the existence and enforceability of the Agreement by raising the affirmative defenses of lack of consideration and failure of consideration. Answer at 3 ¶¶ 2-3. Under these circumstances, the court finds it appropriate to allow SCIG to proceed on its quantum meruit claim in the alternative.

## IV. Fraudulent Inducement

SCIG alleges that Optum fraudulently induced it to enter into the LOA and the Agreement by falsely representing that Optum had the "present capacity to form and implement the required provider network ... and the present existence of a provider network which would be available to implement" the parties' goals. Am. Countercl. ¶¶ 27, 29. SCIG specifically asserts that it relied on those representations when it decided to enter into the LOA, but does not make a similar assertion as to the Agreement. Id. ¶ 28. Optum argues that SCIG has failed to plead the essential elements of fraudulent inducement. The court agrees.

Minnesota law "establishes a high threshold of proof" for fraudulent inducement claims. Martens v. Minn. Mining & Mfg. Co., 616 N.W.2d 732, 747 (Minn. 2000). SCIG must plead with specificity that (1) Optum made a false representation regarding its ability to form and implement the provider network required to allow the parties to proceed under the LOA and the Agreement, (2) the representation was material and susceptible of knowledge, (3) Optum

9

knew its representation was false or made the representation without regard to its truth or falsity, (4) Optum intended to induce SCIG to enter into the LOA and the Agreement, (5) SCIG did enter into the LOA and the Agreement, (6) SCIG suffered damages, and (7) the misrepresentations proximately caused the damages. Id.

SCIG has failed to meet this standard because, even assuming that the statements were false, SCIG does not allege that Optum made them knowing they were false or without knowing whether they were true or false. Further, the statements that SCIG allegedly relied on were all made after the parties entered into the LOA, see Am. Countercl. ¶ 27, which belies SCIG's assertions of reliance and causation as to the LOA. Further, SCIG fails to even generally allege that it relied on the representations in deciding to sign the Agreement. As a result, the court must dismiss the fraudulent inducement claim.

The court declines to allow SCIG to replead its counterclaims given that it has already done so once. The court does not believe a third bite at the apple will yield a different result.

## CONCLUSION

Accordingly, based on the above, **IT IS HEREBY ORDERED** that the partial motion to dismiss [ECF No. 17] is granted in part as set forth above.

Dated: August 21, 2018

s/David S. Doty
David S. Doty, Judge
United States District Court
