UNITED STATES DISTRICT COURT
                       DISTRICT OF MINNESOTA
                     CIVIL NO. 18-800(DSD/BRT)

OptumHealth Care Solutions, LLC,

           Plaintiff,

v.                                                      **ORDER**

Sports Concussion Institute Global, Inc.,

           Defendant.

>    Vanessa J. Szalapski, Esq., Michelle S. Grant, Esq. and Dorsey
>    & Whitney LLP, 50 South 6th Street, Suite 1500, Minneapolis,
>    MN 55402, counsel for plaintiff.
>
>    Mark K. Thompson, Esq. and Mkt Law, PLC, 4927 34th Avenue
>    South, 100 Nokomis Professional Building, Minneapolis, MN
>    55417, counsel for defendant.

This matter is before the court upon the motion for summary judgment by plaintiff (and counterclaim defendant) OptumHealth Care Solutions, LLC (Optum). Based on a review of the file, record, and proceedings herein, and for the following reasons, the court grants the motion.

## BACKGROUND

This contract dispute arises out of an agreement between Optum and defendant (and counterclaim plaintiff) Sports Concussion Institute Global, Inc. (SCI). Optum is a health care services company. SCI, headed by Dr. Tony Strickland, develops concussion management systems. Strickland Dep. at 42:31-25:25, 28:20-29:3.

At Strickland's initiation, the parties executed several agreements, only the last of which is relevant here.

**I.   The Agreement**

On October 20, 2016, the parties entered into a Marketing Agreement (Agreement), under which they agreed to explore the possibility of creating a network to provide concussion services to members of the class action settlement arising from the National Football League players' concussion injury litigation. Szalapski Decl., ECF No. 74, Ex. 2 at 1, 10.  The Agreement expressly states that it was for the purpose of "promoting" the parties' "future relationship" and that another "potential[]" agreement would be needed to finalize any such relationship.  Id. at 1; see also Strickland Dep. at 57:11-18, 220:11-15 (acknowledging that the Agreement was a "placeholder"); Reilly Dep. at 32:22-33:6 (explaining that Optum uses marketing agreements to "keep the parties at the table" as they "hammer out specific contractual points of what each party will provide").

The parties anticipated working closely with third-party Garretson Resolution Group (GRG).  Adler Dep. at 65:9-18; Wolf Dep. at 8:14-25; Szalapski Decl. Ex. 26, at 1.  At the time, GRG was separately negotiating a deal with SCI under which SCI would establish "a network of neuropsychologists and other health care

providers ... to provide certain services to former members of the NFL in connection with that certain Class Action Settlement Agreement" arising from the NFL concussion litigation. Szalapski Decl. Ex. 26, at 1. Optum was brought into the discussion because it already had agreements with providers that administer the kinds of health care services "expected to be provided in connection with the NFL Settlement." Id. GRG hoped to get many qualified providers to serve the NFL settlement class through a potential arrangement with Optum and SCI. Id. at 2; Wolf Dep. at 62:4-16. Optum and SCI, in turn, hoped to "establish a preferred relationship with each other in which Optum, with SCI's assistance, w[ould] create, own, and manage a nationwide integrated behavioral health network of Providers ... for the identification and treatment of post-concussion syndrome and related neurobehavioral disorders." Szalapski Decl. Ex. 2, at 1.

Among other things, under the Agreement, Optum agreed to establish and execute a "marketing plan" within thirty days and to pay SCI a $2.5 million "marketing fee." Id. § 1.2; id. § 2.1. The parties agreed that the marketing fee was a "prepaid fee" and that "Optum expect[ed] to receive the services and rights described in [the] Agreement." Id. § 6.2(e). In return, SCI agreed to "market and promote" the parties' network "as reasonably required

by Optum and in compliance with the Marketing Plan." Id. § 3.1. The parties authorized each other to use their "logos, trade names, trademarks and proprietary notices" in furtherance of the Agreement. Id. §§ 4.1, 4.2. They agreed to share the net revenue earned under the Agreement after SCI repaid the $2.5 million marketing fee. See id. § 3.4(a)-(b). The Agreement had a three-year initial term beginning on October 20, 2016. Id. § 6.1(a). The parties were permitted to terminate the Agreement at any time with ninety days' written notice. Id. § 6.2(b). In the event of termination before the initial term expired, SCI agreed to "immediately pay" Optum an "early termination fee" calculated as follows: $2.5 million less any net margin payments received by Optum. Id. § 6.2(e). The Agreement prohibits either party from recovering "consequential, incidental, indirect, exemplary, special, treble or punitive damages (including without limitation, damages for loss of goodwill, work stoppage, computer malfunction, lost or corrupted data, lost profits, lost business or lost opportunity), or any other similar damages under any theory of liability." Id. § 7.2(a).

**II. Execution of the Agreement**

It is undisputed that Optum never established a marketing plan as called for under the Agreement. It is also undisputed,

4

however, that SCI nevertheless began marketing the parties' network via email, social media, the SCI website, and press releases. See Szalapski Decl. Ex. 6; Strickland Dep. at 140:13-144:17. There is no indication in the record that SCI ever complained to Optum about the lack of a marketing plan.

In addition to engaging in marketing, SCI worked closely with Optum and GRG to more fully explore the project and how it would work. See Reilly Dep. at 219:4-220:10; Adler Dep. at 142:14-144:9. After several months of discussions, Optum concluded that the project was untenable for numerous reasons. First, Optum discovered that the Optum/SCI network could not be exclusive providers for the NFL concussion settlement. See Szalapski Decl. Ex. 9; Wolf Dep. at 23:18-24:6, 47:23-48:4, 61:11-62:2, 104:25-105:12; Reilly Dep. at 233:13-234:3. Second, GRG would not permit Optum and SCI to provide or be reimbursed for administrative services. See Szalapski Decl. Ex. 9; Reilly Dep. at 188:14-189:2. Third, any fee the Optum/SCI network would receive for its services would be lower than anticipated because it was predetermined by the NFL concussion settlement. See Szalapski Decl. Ex. 9; Reilly Dep. at 141:16-145:8, 186:3-8, 190:7-18. Fourth, Optum's providers would be reimbursed at a lower amount than providers who contracted directly with GRG. See Szalapski Decl. Ex. 9; Reilly

5

Dep. at 143:9-20, 185:14-186:8, 190:7-18. Fifth, GRG required that Optum assume liability for the medical care provided. See Szalapski Decl. Ex. 9. Finally, GRG required Optum to enter into new contracts with its providers. Id. Optum deemed these issues to be "fundamental structural issues" that could not be resolved. Id. Optum communicated its concerns to Strickland in April 2017. Id. Strickland understood Optum's concerns to mean that it would not proceed with the project and that it would "come after" him for the $2.5 million "advance payment." Id. Ex. 14.

**III. Termination of the Agreement**

On June 20, 2017, Optum formally notified SCI that it was terminating the Agreement effective September 21, 2017. Id. Ex. 12. Optum informed SCI that it was obligated to "return the $2.5 million marketing fee"[1] under § 6.2(e) of the Agreement. Id. SCI did not substantively respond to that letter or to subsequent requests by Optum for payment. See id. Ex. 16.

**IV. This Action**

On March 22, 2018, Optum filed this action alleging breach of contract based on SCI's failure to pay the termination fee. SCI filed an answer and counterclaims, and later filed amended

---

[1] Optum stated that it was owed the full $2.5 million because it had not received any net margin payments from SCI. Id. SCI has not refuted this statement.

6

counterclaims alleging breach of fiduciary duty, breach of contract, breach of the implied covenant of good faith and fair dealing, quantum meruit, and fraud in the inducement. Optum moved to dismiss the breach of fiduciary duty, quantum meruit, and fraudulent inducement counterclaims. The court granted the motion in part, dismissing the fiduciary duty and fraudulent inducement counterclaims. ECF No. 36. Optum now moves for summary judgment on its breach of contract claim and SCI's remaining counterclaims.

## DISCUSSION

### I. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party.

7

Id. at 255.  The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. Celotex, 477 U.S. at 324.  A party asserting that a genuine dispute exists – or cannot exist – about a material fact must cite "particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A).  If a plaintiff cannot support each essential element of a claim, the court must grant summary judgment because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial.  Celotex, 477 U.S. at 322–23.

**II.  Optum's Breach of Contract Claim**

Optum argues that it is entitled to summary judgment on its breach of contract claim because SCI undisputedly owes $2.5 million under § 6.2(e) of the Agreement.  SCI essentially argues, first, that Optum cannot prevail on its breach of contract claim because Optum breached the Agreement first and, second, the Agreement is illusory and therefore unenforceable.  SCI does not otherwise deny that the Agreement obligates it to pay Optum $2.5 million.  Neither of SCI's argument have merit.

**A.  Optum's Breach**

SCI argues that it is relieved of its obligation to pay Optum

under the Agreement because Optum breached it first by not providing a marketing plan. As noted, the Agreement required Optum to provide a "marketing plan outlining the types of marketing that the parties will engage in" within thirty days of executing the Agreement. Szalapski Decl. Ex. 2 § 1.2. Optum does not dispute that it failed to do so.

"Under general contract law, a party who first breaches a contract is usually precluded from successfully claiming against the other party; the first breach serves as a defense against the second breach." Winthrop Res. Corp. v. Eaton Hydraulics, Inc., No. 01-649, 2002 WL 35453165, at *6 (D. Minn. Apr. 23, 2002) (citing Carlson Real Estate Co. v. Soltan, 549 N.W.2d 376, 379 (Minn. Ct. App. 1996); MTS Co. v. Taiga Corp., 365 N.W.2d 321, 327 (Minn. Ct. App. 1985)). "A breach of contract occurs when a party unjustifiably hinders the other party from performing." Id. (citing Zobel & Dahl Constr. v. Crotty, 356 N.W.2d 42, 45 (Minn. 1984)). "Under such circumstances, the non-breaching party is excused from performing under the contract." Id.

Here, SCI has provided no evidence that Optum's failure to provide a marketing plan hindered its ability to perform under the Agreement. Indeed, SCI began marketing the parties' network via email, social media, the SCI website, and press releases, despite

9

the lack of a marketing plan, and the parties worked closely for several months on the project. Further, Optum's obligation to provide a marketing plan was untethered to the marketing fee and SCI's obligation to repay it following termination. As noted by Optum, either party had the right to terminate the Agreement at any time regardless of the existence, or lack thereof, of a marketing plan. See Szalapski Decl. Ex. 2 § 6.2. There is simply no causal relationship between the lack of a marketing plan and SCI's failure to repay the marketing fee.

In addition, SCI waived its right to complain about Optum's breach by proceeding without objection under the Agreement for months after Optum was due to deliver the marketing plan. See BOB Acres, LLC v. Schumacher Farms, LLC, 797 N.W.2d 723, 727-28 (Minn. Ct. App. 2011) (quoting Patterson v. Stover, 400 N.W.2d 398, 401 (Minn. Ct. App. 1987)) ("Ignoring a provision in a contract will constitute waiver if the party whom the provision favors continues to exercise his contract rights knowing that the condition is not met."); Dayton Dev. Co. v. Gilman Fin. Servs., Inc., 419 F.3d 852, 858 (8th Cir. 2005) ("Minnesota law treats the continued performance of a party following the failure of the other party to comply with a contract term as a voluntary waiver of that contract term[.]").

In sum, Optum's failure to provide a marketing plan did not excuse SCI from complying with its obligation to repay the marketing fee.

**B.    Illusory Contract**

SCI also argues that the Agreement is illusory and therefore unenforceable. SCI specifically contends that, because § 6.2 of the Agreement required SCI to repay the $2.5 million it received from Optum on termination of the Agreement, Optum did not give SCI anything of value. "For a contract to be illusory, and therefore without consideration, one party must have no obligations to perform whatsoever." Klosek v. Am. Express Co., No. 98-426, 2008 WL 4057534, at *12 (D. Minn. Aug. 26, 2008) (citing Brozo v. Oracle Corp., 324 F.3d 661, 671 (8th Cir. 2003); Grouse v. Grp. Health Plan, Inc., 306 N.W.2d 114, 116 (Minn. 1981)).

The court cannot conclude that Optum did not have an obligation to perform under the Agreement. Optum gave SCI the prepaid $2.5 million marketing fee in addition to the right to use Optum's "logos, trade names, trademarks and proprietary notices" in furtherance of the Agreement. See Szalapski Decl. Ex. 2 § 4.1.

Further, the fact that SCI was obligated to repay the marketing fee does not render the Agreement illusory. The marketing fee was essentially a loan to allow SCI to proceed with

11

marketing efforts during the initial term of the Agreement. Minnesota courts have long held that loan agreements are enforceable and non-illusory. Estrada v. Hanson, 10 N.W.2d 223, 225 (Minn. 1943).

As a result, because the Agreement was not illusory, summary judgment is warranted on Optum's breach of contract claim. Given the plain language of § 6.2 of the Agreement, there is no genuine issue of material fact as to the amount owed by SCI.[2] The court will therefore award Optum $2.5 million in damages.

**III. SCI's Counterclaims**

Optum also moves for summary judgment on SCI's remaining counterclaims for breach of contract, breach of the implied covenant of good faith and fair dealing, and quantum meruit.

    **A.   Breach of Contract**

Optum argues that SCI's breach of contract claim should be dismissed for several reasons, including that the damages claimed by SCI are precluded by the Agreement. The Agreement prohibits either party from recovering "consequential, incidental, indirect, exemplary, special, treble or punitive damages (including without

---

[2] SCI agreed to pay Optum an "early termination fee" in the amount of $2.5 million less any net margin payments. Szalapski Decl. Ex. 2 § 6.2(e). SCI does not dispute that Optum received no such payments. Accordingly, Optum is entitled to the full $2.5 million.

limitation, damages for loss of goodwill, work stoppage, computer malfunction, lost or corrupted data, lost profits, lost business or lost opportunity), or any other similar damages under any theory of liability." Szalapski Decl. Ex. 2 § 7.2(a).  SCI expressly seeks damages for lost profits and lost business opportunities. See id. Ex. 21, at 4-5; Strickland Dep. at 201:12-203:13.  Even assuming those damages were supported by evidence, which they are not, SCI is expressly prohibited from seeking them.[3]  As a result, SCI's breach of contract claim fails.

### B. Breach of the Implied Covenant of Good Faith and Fair Dealing

SCI's claim for breach of the implied covenant of good faith and fair dealing claim fails for the same reason.  A claim for breach of the implied covenant of good faith and fair dealing is a contract-based claim.  In re Hennepin Cty. 1986 Recycling Bond Litig., 540 N.W.2d 494, 503 (Minn. 1995).  The covenant "does not extend to actions beyond the scope of the underlying contract."  Id.  To establish a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must show

---

[3] SCI failed to even respond to this aspect of Optum's motion, among others, which means that it has conceded the issue. Graham v. Rosemount, Inc., 40 F. Supp. 2d 1093, 1101 (D. Minn. 1999) (holding that a failure to respond to arguments constitutes a waiver of the issue).

13

that it was damaged by the alleged breach. See Cox v. Mortg. Elec. Registration Sys., Inc., 685 F.3d 663, 670-71 (8th Cir. 2012) (dismissing plaintiff's claim for breach of the implied covenant of good faith and fair dealing because plaintiff failed to allege damages caused by defendant).

As discussed above, SCI has not established that it is entitled to damages not prohibited under the Agreement. Consequently, SCI's counterclaim for breach of the implied covenant of good faith also fails.

**C.   Quantum Meruit**

As noted in the court's previous order, "there can be no recovery in quantum meruit where a valid express contract between the parties exists." In re Stevenson Assocs., Inc., 777 F.2d 415, 421 (8th Cir. 1985). The court allowed this claim to proceed as alternatively pleaded given SCI's affirmative defenses calling into question the Agreement's validity. See ECF No. 36, at 9. Because the court has herein determined that the Agreement is valid and enforceable, it must dismiss SCI's quantum meruit counterclaim.

**IV. Affirmative Defense**

In its answer, SCI raised the affirmative defense of fraud, claiming that Optum made misrepresentations about its "present

capability to form the provider network required to effectuate the agreement between the parties, and/or the present existence of a viable provider network[.]"[4] ECF No. 16, at 3 ¶ 8. Optum moved for summary judgment on this defense, but SCI failed to respond to that aspect of Optum's motion. As a result, SCI has waived the issue and Optum is entitled to its requested relief. Graham, 40 F. Supp. 2d at 1101.

## CONCLUSION

Accordingly, based on the above, **IT IS HEREBY ORDERED** that:

1. The motion for summary judgment [ECF No. 68] is granted; and

2. Plaintiff is entitled to judgment in the amount of $2.5 million, with pre- and post-judgment interest to be determined.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: October 29, 2020            s/David S. Doty
                                   David S. Doty, Judge
                                   United States District Court

---

[4] As discussed in the context of Optum's breach of contract claim, SCI's affirmative defenses of lack of consideration and failure of consideration are meritless and will not be addressed again here.